**In re BIG RIVERS ELECTRIC CORP., Debtor.**

**Bankruptcy No. 96–41168(2)11.**

United States Bankruptcy Court, W.D. Kentucky.

May 30, 1997.

Sullivan Mountjoy, Stainback & Miller, P.S.C., Michael A. Fiorella, Felicia S. Turner, Owensboro, KY and Long Aldridge Norman LLP, Laura F. Nix, Mark St. Kaufman, Russell A. Tolley, Atlanta, GA, for Big Rivers Electric Corp.

Richard S. Miller, Diane Coffino, New York City, for LG&E Energy Corp.

Frank P. Doheny, Jr., Louisville, KY, Simpson Thacher & Bartlett, Michael P. Graney, Columbus, OH and Mark Thompson, New York City, for Chase Manhattan Bank.

Buchanan, Ingersoll Professional Corp., Thomas L. Vankirk, Kenneth E. Aaron, John R. Leathers, Stephen G. Allen, Lexington, KY, for Green River Coal Co., Inc.

Richard C. Josephson, Portland, OR and McBrayer, McGinnis, Leslie & Kirkland, Christopher M. Hill, William D. Kirkland, Frankfort, KY, for PKEC.

David C. Brown, W. Robinson Beard, Stites & Harbison, Louisville, KY and Dann, Pecar, Newman & Kleinman, Indianapolis, IN and Holland & Knight, Atlanta, GA, for Alcan Aluminum Corp. and NSA, Inc.

Joseph J. Golden, Assistant U.S. Trustee, U.S. Trustee's Office, Louisville, KY.

Allison Wade, Holland & Knight, Atlanta, GA.

Charles W. Ritz, III, Parr, Richey, Obremsky & Morton, Indianapolis, IN.

James G. Bruen, U.S. Dept. of Justice, Civil Div./Comm. Lit. Branch, Washington, DC.

Jeffrey L. Tanenbaum, Weil, Gotshal & Manges, LLP, New York City.

Phillip G. Abshier, Bamberger & Abshier, Owensboro, KY.

Alan C. Stout, Marion, KY.

Bill R. Paxton, Central City, KY.

## MEMORANDUM–OPINION

J. WENDELL ROBERTS, Bankruptcy Judge.

This matter is presently before this Court on four(4) interrelated motions: (1) PacifiCorp Kentucky Energy Company's Motion to Disqualify Bankruptcy Judge and Remove and Sanction Examiner, in which PacifiCorp Power Marketing, Inc. joins; (2) Green River Coal Co., Inc.'s ("Green River") Motion to Disqualify Bankruptcy Judge and to Remove Examiner; (3) The Motion of PacifiCorp Kentucky Energy Company and PacifiCorp Power Marketing, Inc. (Collectively referred to as "PacifiCorp Entities") to Stay Proceedings Pending Rulings on Motions to Disqualify the Bankruptcy Judge and Remove the Examiner; and (4) The Examiner's Motion to Impose Sanctions against PacifiCorp Kentucky Energy Company and Its Attorney Pursuant to Rule 9011. Having read the numerous and lengthy briefs filed pursuant to these Motions, and having fully considered the matters at great length, the Court overrules the first three motions and will consider the fourth at a later date.

The Court would have preferred another Judge rule on the three Motions since they question the impartiality of the undersigned. This Court acknowledges the tremendous difficulty visited upon it by being asked to rule upon the fairness of its own conduct, which has been called into question by the Motions to Disqualify. Even with the exercise of the upmost level of scrupulousness in considering this matter, the Court recognizes the impossibility of completely insulating itself from a suggestion of partiality and bias. This Court finds such a task particularly daunting in light of the extensive efforts the Court has engaged in to protect and preserve the integrity of this proceeding, as well as the fairness accorded to all parties involved herein. However, the Court has the duty to make a ruling rather than shift this burden to another Judge.

The Court, therefore, enters its Findings of Facts and Conclusions of Law as follows.

## FINDINGS OF FACTS
### A. HISTORY OF THE CASE.

On September 25, 1996, Big Rivers filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Since the petition date, Big Rivers has continued to operate its business and manage its properties pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

Big Rivers is a non-stock, not-for-profit rural electric cooperative which provides electricity to its four member cooperatives. Together, the four member cooperatives serve approximately 90,000 customers in Western Kentucky. A detailed summary of Big Rivers' pre-petition problems which led to its Chapter 11 bankruptcy filing are set forth in the "Omnibus Declaration in Support of Big Rivers Electric Corporation's Chapter 11 Filing" ("Omnibus Declaration"). While the Omnibus Declaration was prepared by Big Rivers, it provides a detailed summary of the principal issues relating to the Debtor's financial history. In summation, the document reveals that prior to filing its Chapter 11 bankruptcy action, Big Rivers was faced with a significant number of problems arising from a variety of factors, including, poor management, dishonest employees, unfavorable business conditions, and Big Rivers' default on its obligation to the Rural Utilities Service ("RUS") f/k/a the Rural Electrification Administration. One month prior to the petition date, Big Rivers purported to enter into a long-term lease agreement with PacifiCorp Kentucky Energy Company ("PKEC"), pursuant to which PKEC would lease substantially all of Big Rivers' generating assets. The Agreement was drafted in contemplation of Big Rivers' Chapter 11 case and, by its terms, required the approval of the Bankruptcy Court.

Big Rivers' Omnibus Declaration, filed as part of this bankruptcy action, sets forth five primary goals Big Rivers sought to achieve by filing the bankruptcy action:

1) to restructure its debt obligations which were in default or would shortly go into default;

2) to reject or restructure certain highly burdensome long-term coal supply contracts;

3) to resolve its outstanding litigation with various parties;

4) to "receive judicial approval for consummating a long-term lease transaction involving, *inter alia,* Big Rivers' generation assets;" and

5) to implement its financial restructuring in a timely fashion.

Omnibus Declaration at p. 7.

The Omnibus Declaration goes on to set forth Big Rivers' strategy, as anticipated as of the petition date, for accomplishing a Chapter 11 reorganization. The key part of Big Rivers' reorganization, as set forth in that document, was the PKEC offer to lease and operate Big Rivers' assets.

The terms of the PKEC lease transaction are discussed in general terms throughout the Omnibus Declaration. Significantly, however, the Omnibus Declaration does not disclose the existence of a "No Shopping" clause in the PKEC Agreement which, at the very least, greatly limited Big Rivers' ability to consider any offer in any form from any other entity. The Omnibus Declaration erroneously states that the proposed PKEC transaction would achieve the highest cash flow and was in the best interest of Big Rivers' creditors and members.

As subsequent events have unfolded, it has become apparent that the original version of the PKEC offer was not the "best" offer Big Rivers would receive for its assets[1], nor was it even PKEC's final or best offer[2].

---

1. The PKEC transaction as it existed as of the petition date offered Big Rivers $90 to $120 million less than LG&E Energy Corp.'s winning bid that resulted from the bidding procedure ultimately held in this action. The bidding procedure is subsequently addressed in detail in this Opinion.

2. After the petition date, PKEC increased its proposal by tens of millions of dollars.

## B. *APPOINTMENT OF THE EXAMINER.*

In October of 1996, approximately one month after Big Rivers filed its bankruptcy petition, several large unsecured creditors holding claims in excess of $150 million moved for the appointment of a Chapter 11 Trustee to take over the management of Big Rivers. These Creditors included Chase Manhattan Bank, N.A. ("Chase"), the Bank of New York ("BNY"), Bluegrass Containment, Inc. ("Bluegrass") and Mapco Equities, Inc. ("Mapco"). In addition, Bluegrass and Mapco moved the Court, in the alternative, to appoint an Examiner.

The primary grounds asserted in support of the Motions included the following: (1) questions regarding whether the proposed PKEC transaction would maximize the value of the estate; (2) lack of confidence in Big Rivers' management; and (3) alleged conflicts of interest inherent in Big Rivers' structure of its Board of Directors. *See In re Cajun Elec. Power Coop. Inc.,* 74 F.3d 599 (5th Cir.1996), *Modifying,* 69 F.3d 746 (5th Cir.1996) *cert. denied,* — U.S. —, 117 S.Ct. 51, 136 L.Ed.2d 15 (1996); *In re Colorado–Ute Electric Ass'n, Inc.,* 120 B.R. 164 (Bankr.D.Colo.1990). The most critical concern, however, was the question of whether Big Rivers was meeting the fiduciary duty incumbent upon it to maximize the value of the estate.

After a hearing on these Motions, this Court entered an Order on October 16, 1996, directing the U.S. Trustee to appoint an Examiner on or before 4:00 p.m. EDT October 18, 1996. While the appointment of a Trustee may well have been in the best interest of the creditors, this Court was concerned that it was too early in the case to take control away from Big Rivers. The Court did conclude, however, that the appointment of an Examiner was required by 11 U.S.C. § 1104(c)(2) as a matter of law[3] due to Big

---

3. § 1104(c) requires the appointment of an examiner:

to conduct such an investigation of the debtor as is appropriate, including an investigation of any allegations of fraud, dishonesty, incom-

Rivers having fixed, liquidated, unsecured debts in excess of $5 million. *In re Revco D.S., Inc.,* 898 F.2d 498 (6th Cir.1990).

The use of the term "Examiner" was, however, somewhat of a misnomer in this case, as the Order directed the "Examiner" to have greatly expanded powers and duties in addition to those conveyed upon examiners under the general provisions of § 1106(b). The October 16, 1994 Examiner Order provides, in part:

> IT IS FURTHER ORDERED that in addition to the powers and duties set forth in 11 U.S.C. § 1106(b), the Examiner shall:
> 1) Investigate all allegations set forth in the BC Motion, the Chase/BYN Motion, and MAPCO Motion (collectively "Trustee Motions") concerning the alleged mismanagement and/or breaches of fiduciary duty by Big Rivers;
> 2) Prepare a Report, to be filed under seal with this Court, concerning the validity of the allegations set forth in the Trustee motions;
> 3) Work with Big Rivers and its creditors in (a) facilitating discovery concerning the Trustee Motions; (b) resolving various disputes with creditors, including Green River Coal Co., Inc. ("Green River"); and (c) if feasible, attempt to negotiate a global settlement of the disputes in this case and the development of a consensual plan of reorganization.
>
> In making this report, the Examiner shall have the right to review all of Big Rivers' files and records, including any files maintained by Big Rivers' attorneys and accountants, except for legal files directly relating to Big Rivers' bankruptcy. *The Examiner shall be prohibited from disclosing any of his or her findings or any of the records and files he or she may review in this matter to any party other than the Court, without prior Court order*
> . . .

(Emphasis added.)

Thus, the Examiner Order mandated the Examiner to communicate only with the Bank-

ruptcy Court, unless otherwise instructed by the Court. No party, including the PacifiCorp Entities or Green River, objected to this provision in the Examiner Order, nor did any party seek to appeal the Order, or have it modified or limited.

In accordance with the Order's directives, the U.S. Trustee's office promptly appointed J. Baxter Schilling as the Examiner. Shortly thereafter, counsel for Big Rivers, Mike Fiorella, sought to amend the October 16, 1996 Order to include additional language relative to confidentiality and disclosure of information obtained by the Examiner. Big Rivers and the Examiner reached a consensual agreement regarding the language to be added. Specifically, the Modified Consensual Order retained the mandate that Mr. Schilling not disclose any of his findings to anyone other than the Court without prior Court order, and in addition added: "Nothing herein shall limit or prevent the Court from taking such actions or issuing such orders as the Court may determine to be warranted after the Examiner makes any report to the Court concerning his investigation."

This "consensual order" was prepared and tendered to the Court by Big Rivers. It was entered by the Court on October 22, 1996, and was served on all parties listed on the short list, including the PacifiCorp Entities and Green River. Significantly, no entity involved in this bankruptcy proceeding: (1) filed an appeal from the Modified October 16 Consensual Order; (2) filed a motion under Bankruptcy Rule 9014 to alter, amend or vacate any part of the Order; or, (3) filed a Motion under Bankruptcy Rule 9023 to amend or alter the Order. Thus, the Modified Consensual Order of October 22, 1996 became the law of the case.

The Modified Order requires the Examiner to make reports to the Bankruptcy Court on a confidential basis, regarding the results of his investigation and his efforts to mediate

petence, misconduct, mismanagement or irregularity in the management of the debtor, if ——

.  .  .  .  .

(2) the debtor's fixed, liquidated, unsecured debts, other than debts for goods, services, or

taxes, or owing to an insider, exceed $5,000,-000.00.

settlements in this case. Specifically, the Modified Order calls for adherence to the following process: (1) the Examiner performs his duties as set forth; (2) the Examiner then makes reports to the Court relating to those duties on an ex parte basis; and (3) the Court then either directs the Examiner to discuss the matters confidentially disclosed to the Court with entities or parties in the case or he informs the Examiner that such disclosure is not appropriate.

### C. *EXAMINER'S EFFORTS TO NEGOTIATE A SETTLEMENT.*

Throughout his appointment as Examiner, Mr. Schilling has worked diligently, expending massive hours and energy in accordance with the October 22, 1996 Order, to achieve a global resolution of this case. Mr. Schilling has engaged in numerous and lengthy settlement negotiations involving all major parties to this action. As a direct result of Mr. Schilling's efforts, settlements have now been reached with all parties involved in the action, except for the PacifiCorp Entities and Green River, and the value to be brought into the estate from a lease transaction involving this case. Mr. Schilling's efforts have included: aiding various parties, including other third-parties interested in acquiring Big Rivers' assets; obtaining crucial financial, corporate, and regulatory information from Big Rivers; resolving disputes between the parties; and, assisting the various parties in reaching a resolution of this case, with a global resolution now being a reality or certainly within short reach. These massive accomplishments, which have occurred in a mere eight months, are not only remarkable, especially in light of the fact that most of the parties have been at an impasse many years, but are also an excellent testimony to the tremendous efforts of the Examiner, Big Rivers, the RUS, Green River, and various unsecured creditors.

### D. *KNOWLEDGE OF CONFIDENTIAL COMMUNICATIONS BETWEEN THE EXAMINER AND THE COURT.*

All entities actively involved in this case, including the PacifiCorp Entities and Green River, have known since the Examiner's appointment that confidential discussions were occurring between the Court and the Examiner in the course of the Examiner executing his duties. Pursuant to this Court's authorization and directives, the Examiner has had numerous discussions with counsel for the RUS, Chase, BNY, the four member co-ops, NSA, Inc. ("NSA"), and Alcan Aluminum ("Alcan"), Green River, Mapco and Big Rivers. The subject matter of these meetings were discussed in ex parte communications between the Court and the Examiner. Due to the magnitude of the discussions and the parties involved, as well as the crucial nature of the issues, all parties were aware of the occurrence of the confidential discussions between the Examiner and the Court. Nevertheless, none of the entities objected to the confidential, ex parte discussions prior to February 27, 1997.

Pleadings filed in this case demonstrate that all parties had knowledge of the confidential conversations long before February 1997, but did not object. For example, the Examiner filed a Motion to establish a procedure under §§ 105(a) and 331 of the Bankruptcy Code for the payment of the fees of Examiner and the professionals employed by him. That Motion specifically states that the payment procedure would vary somewhat from that established for other professionals due to the confidential nature of certain activities of the Examiner and the fact that the Examiner's appointment was ordered by the Court, with oversight from the Court. Moreover, the Order authorizing the procedure for the Examiner's interim compensation, entered November 15, 1996, specifically required that the billings be edited to ensure confidentiality.

Additionally, the Examiner's monthly billings—copies of which are distributed to Big Rivers, Counsel for Big Rivers, the RUS, the Chairman of the Big Rivers Unsecured Creditors' Committee and the U.S. Trustee—also demonstrate that the Examiner and the Court have held numerous confidential communications. Nevertheless, no entity involved in this case, prior to February 27, 1997, ever objected to these confidential communications, or argued that they were improper. It was clear to these parties that

such ex parte communications between the Examiner and this Court were authorized by the Modified Consensual October 16, 1996 Order.

Specifically significant is the fact that the PacifiCorp Entities' own Motion and accompanying Affidavit demonstrates that they were fully aware of the occurrence of ex parte communications between the Court and the Examiner at least several weeks before they filed their Motions challenging those communications. *See* paragraphs 5, 6, 10, 12 and 14 of Affidavit of George M. Galloway.

Also significant, during a telephonic conference of February 21, 1997, involving the Examiner, the representatives and attorneys for PKEC, including Mr. Galloway, LG&E Energy Corp. ("LG&E"), East Kentucky Power Cooperative, Inc. ("EKPC"), and Big Rivers, the Examiner states and the Court believes that Mr. Galloway insisted that the Examiner have an ex parte conversation with the Court to conduct with regard to documentation of the PKEC transaction. PKEC does not dispute that Mr. Galloway made such a request, but merely attempts to explain it away (PKEC Reply Memorandum, at p. 23 note 18). Thus, six days before the present motion was filed by PKEC, Mr. Galloway requested the Examiner to have an ex parte communication with the undersigned Judge on PKEC's behalf.

## E. *FACTS LEADING TO THE COURT-ORDERED AUCTION.*

### 1. *November 12, 1996 Report.*

In accordance with the October 16, 1996 Order appointing him, the Examiner investigated the allegations of mismanagement and breaches of fiduciary duty, and worked with the major parties in an effort to facilitate the resolution of disputes and to achieve a global settlement. In addition, the Examiner also made reports to the Court as directed by the October 16, 1996 Order. The Examiner filed a sealed report with the Court on November 12, 1996, in which he preliminarily found, among other things, that Big Rivers had failed to develop bids submitted by parties other than PKEC.

### 2. *Big Rivers Proposed Plan.*

On January 22, 1997, Big Rivers filed its proposed plan of reorganization. The proposed plan, which was based on the PKEC bid, failed to address the Examiner's concerns.

Moreover, the proposed plan provided no mechanism for competitive bidding or marketing the estate's assets. In fact, it *precluded* any further competitive bidding or marketing. Big Rivers attached the proposed PKEC agreement as Exhibit "A" to its proposed plan. Section 5.4 of that Agreement contains a classic "No Shopping" clause, which prohibits Big Rivers from engaging in efforts to pursue a better offer for its assets. This clause reads:

5.4 *No Negotiations with Others.* Except with the prior written consent of PKEC, Big Rivers shall, at all times after the approvals described in Section 8.6 have been obtained, refrain from (a) initiating or soliciting any inquiries or making any proposals with respect to, or engaging in negotiations concerning, or (b) except as required by a court of competent jurisdiction, providing to any person (other than a governmental entity) any confidential information relating to, any business combination with Big Rivers or any lease, acquisition or purchase of all or any significant portion of the Assets.

It was with Big Rivers' filing of its proposed plan that this "No Shopping" clause first came to the Court's attention. This clause has obviously been of grave concern to this Court due to the fact that, absent a fully consensual plan of reorganization, Big Rivers has a continuing fiduciary duty to maximize the return to its creditors. *See generally Wabash Valley Power Ass'n, Inc. v. Rural Electrification Admin.,* 903 F.2d 445 (7th Cir.1990).

At the time it filed the proposed plan of reorganization, Big Rivers did not request the Court to fix a date for a hearing to consider approval of its disclosure statement, indicating that it was not yet ready to go forward with the proposed plan. As aptly described by Green River at a later hearing, the plan was still a "moving target." It was not, as Big Rivers indicated, a "done deal."

On February 4, 1997, Big Rivers filed a motion seeking an indefinite extension of the exclusivity period (through conclusion of a confirmation hearing), and requesting a disclosure statement hearing and a confirmation hearing be scheduled.

### 3. *The LG&E Proposal.*

On February 7, 1997, LG&E sent Big Rivers a letter containing two alternative proposals for the lease or purchase of Big Rivers' assets by LG&E. The letter informed Big Rivers that the LG&E proposed lease transaction added an estimated value of $37 million over the PKEC bid (using the identical present value basis used by Big Rivers for the PKEC bid). With regard to the alternative LG&E proposed asset purchase transaction, the letter informed Big Rivers that it would result in an added estimated present value of $52 million over the PKEC bid. LG&E further informed Big Rivers that, with its cooperation, LG&E could complete due diligence in fourteen days and seek Board approval for the proposed transaction on or before March 5, 1997. Consequently, there would be no delay in the reorganization process. Thus, LG&E's proposal would have provided greater value to Big Rivers within the same time frame as the PKEC bid.

On February 13, 1997, LG&E, as a creditor and party in interest, timely filed a limited objection to Big Rivers' Motion to Extend the Exclusivity Period. LG&E asserted two grounds in support of its Objection:

(1) The Exclusivity Motion was premature; and

(2) Big Rivers should not be granted the open-ended extension it requested, in part, because Big Rivers had failed to comply with its fiduciary duty to maximize the estate, as evidenced by its failure respond to LG&E's proposals and its refusal to allow LG&E to complete its due diligence.

One day thereafter, on February 14, 1997, Big Rivers rejected the LG&E proposal.

At this point, the Examiner also expressed concerned that Big Rivers may have violated its fiduciary duty to maximize the value of its estate by:

(1) the inclusion of the "No Shopping" clause in the PKEC transaction agreement;

(2) hiding behind the "No Shopping" clause when refusing to negotiate with regard to a potentially higher and better bid from LG&E; and

(3) after receipt of the February 7, 1997 proposal from LG&E (which offered Big Rivers identical terms to the PKEC transaction plus an enhanced value), refusing that offer.

On February 18, 1997, LG&E filed a motion seeking entry of an order (1) allowing it to complete its due diligence, (2) finding unenforceable the "No Shopping" provision agreed to by Big Rivers in the proposed transaction agreement with PKEC, and (3) directing that an open and fair auction be conducted in a timely manner, as well as a motion seeking an expedited hearing on the auction motion.

The auction method proposed by LG&E required potential bidders to make a $500,000.00 deposit. If the potential bidder in fact, bid, the $500,000.00 was to be applied to the bid amount. If, after due diligence, the potential bidder opted not to bid, the $500,000.00 was to be forfeited. One significant problem attendant with the LG&E method, however, was a potential risk that all bids could be lost. In the event that both PKEC withdrew from the bidding process and potential bidders, after due diligence, failed to bid, Big Rivers would have been left without any bids or proposed transactions. Consequently, the Court found this proposed method to be risky, and hence unacceptable.

Instead, the Court devised a bidding method, designed to protect the value to the estate at that point already achieved by the PKEC transaction. Any entity wishing to participate in the bidding process would be required, before it began its due diligence, to sign a bid, with a proper corporate guarantee, which committed the entity on terms identical to the PKEC transaction *and* extended the deadline to complete the deal to October 31, 1997.

### 4. *The February 19, 1997 Hearing.*

On February 19, 1997, the Bankruptcy Court held a hearing on the status of reorganization efforts and to consider the Exclusivi-

ty Motion filed by Big Rivers. At that hearing, the Court heard the parties relative to the status to the case, the lack of an agreement with all creditors and the issue of the good faith of Big Rivers in meeting its fiduciary duty to obtain the most value for its creditors. Significantly, the Court entertained arguments for several hours concerning the issue of whether to re-open the bidding process. Many entities addressed the Court and spoke in favor of maintaining the PKEC transaction. Other entities voiced opposition to the PKEC transaction. All parties present in the courtroom, including the PacifiCorp Entities and Green River, were provided a full opportunity to be heard on all issues, including whether an auction should be held. Interestingly, counsel for Green River informed the Court at that hearing that his client was not "on board" with Big Rivers and was in favor of an open bidding process. He recognized that the Court's efforts in pushing Big Rivers to maximize its assets were for the benefit of his client as well as all other creditors.

During this hearing, the Court closely questioned the various parties in order to determine their relative positions regarding this issue. After hearing all arguments, the Court took a recess, during which it considered the various arguments raised by the parties. The Court recognized that in lieu of ordering a re-opening of the bid process, it was faced with two unpleasant choices due to the absence of a consensual plan. On the one hand, the Court could ignore the objections of LG&E, a creditor of Big Rivers who had standing to raise the fiduciary duty/good faith issues through the planned confirmation process. Such a course would have created a litigation guagmire of epic proportions, with numerous hearings required to value each facet of the various offers and possible offers and then make a comparison thereof. In the alternative, the Court could schedule a series of equally burdensome hearings on LG&E's Motion for an auction. That course of action could have led to the end of the exclusivity period or a different, longer version of the bidding process. Either course of action would have been extremely burdensome to the estate, its creditors and this Court, and could have only produced, at best, an educat-

ed judicial guess with regard to the issue of whether Big Rivers had met its fiduciary duty throughout these proceedings.

This Court determined that a re-opening of the bidding process would be a more effective approach to resolve this matter. Competition in some version of a bidding process is the best and most expedient commercial method known to this Court to determine fair market value. Moreover, the Court determined that a short bidding process would allow the free market to establish whether the price set forth in Big Rivers' Plan was the highest and best price. Additionally, the question regarding Big Rivers' compliance with its fiduciary duty to maximize the assets of the estate would for once and all be conclusively resolved.

Following the recess, the Court informed the parties that in furtherance of Big Rivers' fiduciary duty to maximize the value of the estate, the Bankruptcy Court would conduct a bidding process. The Court then outlined the basic bidding procedures that it intended to implement for interested buyers in order to protect PKEC, Big Rivers, the bankruptcy estate, its creditors and rate payers. The bidding procedure included a requirement that interested bidders consent to be bound by the PKEC bid in the event that PKEC abandoned its bid. To ensure that the plan confirmation process was not delayed, March 19, 1997 was fixed by the Court as the date for submissions of bids and determination of the winning bidder by the Bankruptcy Court.

This Court emphasized the fact that the LG&E proposal, on its face, demonstrated that there was substantial additional value to be maximized by Big Rivers for its estate, which Big Rivers was not pursuing. This issue of fiduciary duties to the estate was the Court's primary concern, and the basis upon which the auction was ordered. It is also important to note, however, that the terms of the auction process also benefitted PKEC. The auction was structured so that any bidder which decided to engage in the bidding process would waive its rights to challenge PKEC in this Court or before the utility regulatory authorities, should PKEC ultimately be the party which acquired the as-

sets of Big Rivers. Moreover, all bidders, other than PKEC, were required to produce bids which exceeded PKEC's offer by at least $10 million, thus providing PKEC with a $10 million threshold for the purpose of ensuring that PKEC's time and efforts in the case were appropriately recognized.

It must be remembered that Big Rivers voluntarily sought the benefits of the bankruptcy court, and by accepting those benefits instantly became a fiduciary for its creditors and was thus charged with the duty of maximizing its assets for such creditors. Accordingly, the focus of Big Rivers and the focus of this Court must be on the creditors, not PKEC.

### 5. *The Auction Order.*

On February 21, 1997, the Bankruptcy Court issued the Auction Order. In the Auction Order, the Bankruptcy Court endeavored to balance the following interests: (1) the estate's interest in maximizing the value of its assets; (2) preservation of the progress made by Big Rivers to date in the Chapter 11 case; (3) the desire of creditors for an expeditious plan and confirmation; and (4) fairness to PKEC.

Thereafter, several parties challenged the Auction Order. First, both Big Rivers and Green River sought leave from the District Court to appeal the Auction Order, and sought to stay the Auction Order pending such appeals. Both stay motions were withdrawn, and while the appeal motions are still pending before the District Court, Big Rivers has requested that the District Court hold its appeal in abeyance. PKEC did not seek leave to appeal the Auction Order. Rather, PKEC filed a Motion to Withdraw the Reference of this case from the Bankruptcy Court and filed the Disqualification Motion with this Court. Green River subsequently joined in the Withdrawal Motion filed by PKEC. In addition, Green River orally joined PKEC's Disqualification Motion on March 19, 1997, and filed its own Disqualification Motion and Supporting Memorandum on April 4, 1997. By Order dated March 18, 1997, the District Court overruled the Motion to Withdraw the Reference.

The Court held the Auction on March 19, 1997. While the PacifiCorp Entities attended the Auction, they chose not to participate in the bidding process. The Auction resulted in a binding commitment from LG&E to enter into a lease transaction providing Big Rivers constituencies an estimated $50 million more than contemplated under the proposed deal with PKEC[4]. Moreover, the LG&E bid proposed a mechanism by which the economic value of the transaction would flow to Big Rivers and its creditors and ratepayers on a faster time-table.

PKEC did not seek leave to appeal the Auction Order. Rather, it instead seeks to upset the favorable resolution by alleging bias on the part of the Bankruptcy Court and seeking disqualification of the Court and removal of the Court-appointed Examiner.

With regard to Green River, while it supported a Court-conducted auction at the February 19, 1997 hearing, it subsequently changed its stance and joined in the Motion to Withdraw the Reference. It subsequently filed its own Motion to Disqualify the Court and Remove the Examiner.

Thereafter, on April 18, 1997, Big Rivers filed an Amended Plan of Reorganization (the "Amended Plan") and related Disclosure Statement (the "Disclosure Statement") based on the LG&E transaction. The Disclosure Statement was subsequently approved at a hearing held on May 12, 1997. A hearing to confirm the Amended Plan has been set for June 9, 1997.

### CONCLUSIONS OF LAW

The PacifiCorp Entities and Green River assert as the legal basis in support of their respective Motions for Disqualification that the confidential communications between the Court and the Examiner violate Bankruptcy Rule 9003 ("B.R. 9003"), and thus disqualification is warranted under 28 U.S.C. § 455(a). Bankruptcy Rule 9003 is a general prohibition against ex parte communications "except as otherwise provided by applicable law." Section 455(a) of Title 28 of the United

---

4. It should be noted that the LG&E bid is between $90–$120 million more than the original

PKEC bid, as it existed on the date that Big Rivers filed for bankruptcy.

States Code provides that a judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." The Movants argue that the Judge and Examiner violated B.R. 9003, and thus, the Judge's impartiality is to be questioned as a direct result of the alleged violation. Consequently, the Movants argue, disqualification is appropriate. The Movants further argue that the violation of B.R. 9003 results as well, in a violation of Canon 3A(4) of the Code of Conduct for United States Judges and Rule 3.5 of the Rules of Professional Conduct.

As addressed hereinafter, not only are the Motions untimely, with the grounds for disqualification and removal thus being deemed to be waived, but also fail on their merits.

## I. THE DISQUALIFICATION MOTIONS ARE UNTIMELY; THUS, THE PACIFICORP ENTITIES AND GREEN RIVER ARE DEEMED TO HAVE CONSENTED TO THE EX PARTE COMMUNICATIONS OF WHICH THEY NOW COMPLAIN.

■ The legal basis for disqualification is found in 28 U.S.C. § 455(a). That section requires, however, that a motion to disqualify a judge must be timely filed. Otherwise, the grounds for recusal are deemed to be waived. *See* 28 U.S.C. § 455(e) ("[w]here the ground for disqualification arises only under subsection (a), waiver may be accepted provided it is preceded by a full disclosure on the record of the basis for disqualification."); *In re City of Detroit*, 828 F.2d 1160, 1167 (6th Cir.1987); *In re Medrano Diaz*, 182 B.R. 654, 658 (Bankr.D.P.R.1995). For purposes of Section 455, a disqualification motion is timely if it is made " 'at the earliest possible moment' after obtaining information of possible bias." *In re Cooke*, 160 B.R. 701, 704 (Bankr. D.Conn.1993). Once a movant becomes aware of facts on which a motion to disqualify is predicated, even a relatively brief delay in filing the motion may result in a finding of untimeliness. *Id.; Apple v. Jewish Hosp. & Medical Center*, 829 F.2d 326, 334 (2d Cir. 1987) (delay of two months after movant learned of facts allegedly requiring recusal rendered motion untimely); *Datagate, Inc. v. Hewlett–Packard Co.*, 941 F.2d 864, 871–72

(9th Cir.1991) (delay of six weeks rendered motion untimely), *cert. denied*, 503 U.S. 984, 112 S.Ct. 1667, 118 L.Ed.2d 388 (1992); *United States v. International Broth. of Teamsters, Chauffeurs, Warehousemen and Helpers, AFL–CIO*, 814 F.Supp. 1165, 1172 (S.D.N.Y.1993) (delay of two months after discovery of relevant facts rendered motion untimely); *Martin–Trigona v. Lavien*, 573 F.Supp. 1237, 1244–45 (C.D.Conn.1983) (delay of 12 days from the time movant indicated probability of recusal motion was excessive), *appeal dism'd*, 770 F.2d 157 (2d Cir. 1985), *cert. denied*, 475 U.S. 1058, 106 S.Ct. 1285, 89 L.Ed.2d 592 (1986).

■ The facts of this case establish that the Motions of Green River and the PacifiCorp Entities are likewise untimely. Both the initial October 16, 1996 Order directing the appointment of the Examiner and the subsequent consensual amended Order dated October 22, 1996, clearly provide that the Examiner would be communicating on issues solely with the Court unless otherwise ordered.

The Sixth Circuit has ruled that orders such as these, appointing an examiner, are final and thus appealable. *In re Revco D.S., Inc.*, 898 F.2d 498, 499 (6th Cir.1990); *accord In re Strowski*, 96 B.R. 1007, 1008 (9th Cir. BAP 1989). Despite an awareness of these Orders, no entity, including the PacifiCorp Entities and Green River, voiced any opposition to or even raised any questions regarding the Orders. Specifically, no entity (1) objected to the provision authorizing ex parte communications between the Examiner and the Court; (2) requested a clarification of any of the provisions contained in the Orders relating to ex parte communications; (3) moved for an amendment of either Order to delete the provisions authorizing ex parte communications between the Examiner and the Court; or (4) appealed from either Order. Thus, the Order appointing the Examiner, as amended on October 22, 1996, is now the law of the case.

The PacifiCorp Entities argue that they first became aware of the ex parte communications on February 12, 14, and 17, of 1997. *See* PacifiCorp Brief at 4–8. This Court finds this assertion disingenuous in light of

the facts in the record and other statements made by PacifiCorp, itself. Unquestionably, all major entities involved in this case have known that the Examiner and the Court have had periodic confidential discussions throughout this proceeding. These conversations, where appropriate, have been disclosed to the various parties involved in this case. In fact, there have been many instances, which the PacifiCorp Entities and Green River themselves reference, in which the Court specifically authorized the Examiner to disclose certain facts relating to settlement or other basic subject matter of those conversations. These instances relate back to the initial confidential communications that occurred between the Court and the Examiner soon after his appointment. Moreover, as the PacifiCorp Entities themselves point out, the Examiner's preliminary report of November 21, 1996, disclosed a second report filed under seal and made available only to the undersigned.

Even if, for the sake of argument, it is assumed that the Movants did not have knowledge of the confidential communications between the Examiner and the Court until February 12, 14 and 17, 1997, this Court notes that neither the PacifiCorp Entities nor Green River voiced any objection or even raised the issue despite an opportunity to do so during the hearing before this Court on February 19, 1997. These entities remained silent on that issue. Significantly, it was only *after* the Court entered the February 21, 1997 Auction Order that PKEC finally voiced its complaints, with PacifiCorp Power Marketing, Inc. joining in that Motion almost two months later on April 4, 1997, and Green River orally joining PKEC's Motion on March 19, 1997, and then subsequently filing its own Motion on April 4, 1997.

■ The purpose of the timeliness requirement is to "prevent waste of judicial resources and to ensure that a movant does not hedg[e] its bet against the eventual outcome' of a proceeding." *In re Cooke,* 160 B.R. at 704. It is abundantly clear that, at a minimum, the *concept* of *ex parte* communications between the Examiner and the Bankruptcy Court was known in October 1996. Nevertheless, both the PacifiCorp Entities,

as well as Green River, remained silent. It is also clear from the record that the actual *fact* that such communications were occurring was obvious to the parties no later than November 1996. Still, the Movants remained silent at that time, as well. The PacifiCorp Entities state that they became aware of the communications on dates early in February 1997, and by their own admissions state an awareness of the allegedly egregious conduct by the February 19, 1997 hearing. Significantly, however, they remained silent at that hearing. It was only after the Bankruptcy Court issued a ruling which could terminate the PacifiCorp Entities' proposed transaction with Big Rivers did PKEC finally make its Motion to Withdraw the Reference and Disqualify the Judge. This series of facts is rather enlightening when considering the PacifiCorp Entities' motives in filing its Motion. If nothing else, it appears clear that they were "hedging their bet against the eventual outcome." This is exactly what the timeliness requirement was intended to preclude. *Cooke,* 160 B.R. at 704.

This Court additionally notes that while Green River asserts that the first time it became aware that ex parte communications were occurring between the Examiner and the Court was at the February 19, 1997 hearing, it did not orally join in PKEC's Motion to Disqualify until one month later, and did not file its own Motion until April 4, 1997. Thus, Green River's Motion would be untimely under the ruling of *Datagate, Inc. v. Hewlett–Packard Company,* 941 F.2d 864, 871–72 (9th Cir.1991) (delay of six weeks rendered Motion untimely), and *Martin–Trigona v. Lavien,* 573 F.Supp. 1237, 1244–45 (D.Conn.1983) (delay of 12 days deemed excessive)

This Court is greatly concerned regarding the issue of judicial economy, the investment of judicial resources, and the time, money and effort expended by the parties in educating the Court so far (over an eight month period) with regard to the details of this case. This Court has acquired a valuable background of experience which would take many months to duplicate if it became necessary to substitute another judge at this juncture.

## II. *THE MOVANTS HAVE FAILED TO ESTABLISH SUFFICIENT GROUNDS FOR DISQUALIFICATION UNDER 28 U.S.C. § 455.*

■ Section 455 of Title 28 of the United States Code governs recusal and disqualification of bankruptcy judges. That statute provides that a judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." A party seeking disqualification must establish three elements to succeed under § 455:(1) that a reasonable basis exists for questioning the impartiality of the judge; (2) the judge's bias must be derived from an extra-judicial source; and (3) the bias claimed may not be a general allegation, but must be focused against the movant(s). *In re Beard,* 811 F.2d 818 (4th Cir.1987); *In re Goodwin,* 194 B.R. 214, 222 (9th Cir. BAP 1996); *In re Colony Square Co.,* 60 B.R. 1003, 1023 (N.D.Ga.1986), *aff'd,* 819 F.2d 272 (11th Cir. 1987), *cert. denied,* 485 U.S. 977, 108 S.Ct. 1271, 99 L.Ed.2d 482 (1988) (citing *Hamm v. Members of Bd. of Regents,* 708 F.2d 647, 651 (11th Cir.1983)); *In re Centre for the Independence of Judges and Lawyers, Inc. v. Mabey,* 19 B.R. 635, 641 (D.Utah 1982).

■ The Movants have not demonstrated facts to support even one prong of this three-part test. In going through this analysis, this Court notes at the outset that judges have an obligation to the bankruptcy estate, the debtor, the creditors, and all parties involved *not* to remove themselves based on frivolous, speculative, or irrational grounds, as "a change in umpire in mid-contest may require a great deal of work to be redone . . . and facilitate judge-shopping." *In re Grossman,* 147 B.R. 903, 908 (Bankr.N.D.Ill.1992); *In re National Union Fire Ins. Co.,* 839 F.2d 1226, 1229 (7th Cir.1988); *In re Betts,* 143 B.R. 1016, 1020 (Bankr.N.D.Ill.1992).

### A. *A REASONABLE BASIS DOES NOT EXIST FOR QUESTIONING THE COURT'S IMPARTIALITY, AS THE CONFIDENTIAL COMMUNICATIONS COMPLAINED OF WERE AUTHORIZED BY ORDERS OF THE COURT.*

■ The test for disqualification and recusal under § 455(a) is an objective one: the inquiry is "whether a reasonable person would have a reasonable basis for questioning the judge's impartiality." *In re Beard,* 811 F.2d at 818 (4th Cir.1987); *In re Goodwin,* 194 B.R. at 222. Thus, disqualification is appropriate only where "an objective, disinterested observer fully informed of the facts [of the case] . . . would entertain a significant doubt that justice be done." *In re Grossman,* 147 B.R. at 908.

The Motions to Disqualify filed by the PacifiCorp Entities and Green River are based entirely on a series of confidential communications between the Examiner and the Court, which were authorized by two final Court Orders, neither of which were challenged by either Movant. The entire foundation of the Movants' arguments for Disqualification under § 455(a) is that the confidential communications violated Bankruptcy Rule 9003.

Bankruptcy Rule 9003 addresses ex parte communications in the context of a bankruptcy case:

(A) General Prohibition. *Except as otherwise permitted by applicable law,* any examiner, any party in interest, and any attorney, accountant, or employee of a party in interest shall refrain from ex parte meetings and communications with the court concerning matters affecting a particular case or proceeding.

(Emphasis added).

Thus, Bankruptcy Rule 9003(a) itself carves out an exception to the prohibition against ex parte communications; i.e., when such communications are authorized by *applicable law*—in this case, being the Examiner Order and the Modified Examiner Order.

The Examiner Order requires the Examiner to perform certain functions, including: (a) investigation of the allegations in the Trustee Motions; (b) assistance in the resolution of the various claims; and (c) if feasible, development of a consensual plan of reorganization. In the course of carrying out those duties, the Examiner Order and the Modified Examiner Order further require that the "examiner shall be prohibited from disclosing *any of his or her findings* or any

of the records or files he or she may review in this matter to any party *other than the Court* without prior Court order." (Emphasis added). The Examiner Order and the Modified Examiner Order do not limit "findings" to the Examiner's investigation of the Trustee Motions. Rather, the Orders broadly require that the Examiner report to the Court in the first instance on all matters within the scope of his appointment. Thus, the Orders mandate confidential communications between the Examiner and the Court. Both the Examiner Order and the Modified Examiner Order are consistent in this mandate. The Modified Examiner Order only added additional protections to Big Rivers to ensure that various privileges would not be inadvertently deemed waived as a result of the Examiner's investigation. Importantly, the Modified Examiner Order reaffirmed that any report by the Examiner would be made confidentially. Moreover, there is nothing in the Examiner Order or the Modified Examiner Order that limits these confidential communications to the filing of written reports, as Green River appears to claim. *See* Green River Motion at 18.

As discussed in great detail above, neither the PacifiCorp Entities nor Green River challenged either the Examiner Order or the Modified Examiner Order in any way, either by seeking reconsideration of the Orders, seeking to amend or alter the Orders, or appealing the Orders. Indeed, the Examiner has performed his duties throughout the bankruptcy case pursuant to the procedures established by those Orders, with the full knowledge of, and without objection by, all interested parties in this case. As discussed in detail above, the Examiner has had numerous meetings with all major entities involved in this case, and has kept the Court informed of the progress of the Big Rivers Chapter 11 case, often at the request of the various parties in interest, including PacifiCorp. All reports to the Court in this case have involved the Examiner's investigation of Big Rivers' conduct. Such investigation and reports to the Court are essential for the purpose of determining whether Big Rivers is properly performing its fiduciary duties. It must be remembered that one of the central allegations of misconduct raised by the

banks in their Trustee Motions related to the PacifiCorp transaction and whether Big Rivers had breached its fiduciary duty to maximize its bankruptcy estate for the benefit of its creditors.

In summation, the Examiner's contacts with the Court did not violate Bankruptcy Rule 9003(a), due to the fact that they were authorized by the Court. All cases cited by the Movant relating to ex parte communications are inapplicable, for in this case the Court through the Examiner Order and the Modified Examiner Order, specifically authorized such confidential communications; hence, that Order triggered the initial clause contained in Rule 9003 which states "Except as otherwise permitted by applicable law ..."

While Green River challenges the ability of the Court to authorize the Examiner to participate in ex parte communications with the Court, Green River cites absolutely no authority for this proposition. *See* Green River Motion at 24–27. Green River simply discusses Congress's intent in passing the general prohibition against ex parte communications. It should be noted, however, that by the specific language of the statute itself, the prohibition is not to control in instances where there is applicable law to the contrary. In this instance, the Modified Examiner Order constitutes applicable law to the contrary and is the law of this case.

**B. THE ALLEGED EX PARTE CONTACTS DID NOT STEM FROM AN EXTRA-JUDICIAL SOURCE.**

To warrant disqualification under § 455(a), an alleged appearance of impartiality should be founded, at least in part, upon an extra-judicial source, and not merely upon what the judge has learned during the course of a particular case. *In re Beard,* 811 F.2d at 827; *See also In re Goodwin,* 194 B.R. at 225; *United States v. Sammons,* 918 F.2d 592, 599 (6th Cir.1990). The Sixth Circuit has followed this rule, holding that disqualification and recusal must be based on an extra-judicial source, the critical test of which is "whether the alleged bias 'stem[s] from an extrajudicial source and result[s] in an opin-

ion on the merits on some basis other than what the judge learned from his participation in the case.'" *Sammons,* 918 F.2d at 599; *Grossman,* 147 B.R. at 910–11 ("the Court's bias must arrive from something other than what the judge learned by participating in the proceedings"); *In re Betts,* 143 B.R. at 1020 ("[a]Judge should not recuse himself if the alleged bias of the judge stems from the facts that the judge learned when participating in the case in his judicial capacity"). For § 455(a) disqualification purposes, the bias must be "personal in nature, 'aris[ing] out of the judge's background and associations' rather than from his participation in the proceedings or prior contact with related cases." *Sammons,* 918 F.2d at 599. Both the PacifiCorp Entities and Green River have failed to demonstrate facts satisfying this requirement.

The Movants base their charges of impartiality entirely on the confidential communications between the Bankruptcy Judge and the Examiner. However, participating in such communications was part of the Court's case management, as directed by the October Examiner Orders entered by this Court. Those Orders made clear that the administration of the bankruptcy proceedings would require the Court to consider the factual analysis and recommendations of the Examiner. The Movants have not alleged, and indeed can make no credible suggestion, that the Court acted outside its judicial capacity in fulfilling those duties contemplated by the October Orders. Absent some showing that the alleged ex parte contacts between the Court and the Examiner were extra-judicial, disqualification is inappropriate.

Moreover, communication between the Examiner and the Bankruptcy Court with regard to the status of negotiations and the potential use of an auction to facilitate a "global settlement" and "development of an essential plan of reorganization" is unequivocally within the scope of the Modified Examiner Order. Furthermore, the use of an Examiner in this manner is hardly unprecedented. *See In re Keene Corp.,* 188 B.R. 903, 912, n. 11 (Bankr.S.D.N.Y.1995) (Court appointed an Examiner to supervise and facilitate plan negotiations, and to report back to

the Court) *In re Public Service Co.,* 99 B.R. 177 (Bankr.D.N.H.1989) (Court appointed Examiner in complicated Chapter 11 case involving a utility with instructions to investigate fraud and other irregularities, and to mediate and assist in breaking a deadlock in plan negotiations); *In re Jartran, Inc.,* 78 B.R. 524, 527 (Bankr.N.D.Ill.1987) (Court appointed Examiner to inquire into relationship between corporate debtor and shareholder-creditor both prior to and subsequent to commencement of debtor's bankruptcy case in which shareholder-creditor and corporate debtor had proposed a joint liquidating plan, with the Examiner being instructed to investigate the likelihood of the existence of possible causes of action by the corporate debtor against the shareholder-creditor and to determine whether conflicts of interest required disqualification of a merged law firm from continuing to represent both the shareholder-creditor and the corporate debtor).

Where, as in this case, the allegations of impropriety stem from ex parte communications occasioned by the exercise of judicial functions known to the parties and contemplated by unchallenged court orders, such contacts cannot be considered "extra-judicial."

## C. THE MOVANTS HAVE FAILED TO DEMONSTRATE A BIAS DIRECTED AGAINST THEM ON BEHALF OF THE JUDGE.

Neither the PacifiCorp Entities nor Green River have made the requisite showing of bias against them personally. *Colony Square,* 60 B.R. at 1023 (*citing Hamm v. Members of Board of Regents,* 708 F.2d 647, 651 (11th Cir.1983)); *Mabey,* 19 B.R. at 641; *In re Shop Television Network, Inc.,* 170 B.R. 413, 418 (C.D.Cal.1994), *aff'd,* 79 F.3d 1154 (9th Cir.), *cert. denied,* — U.S. ——, 117 S.Ct. 168, 136 L.Ed.2d 110 (1996). A party seeking recusal or disqualification under § 455 has the burden of producing facts demonstrating a bias on behalf of the judge "focused against a party to a proceeding." *Colony Square,* 60 B.R. at 1023. Here, the Court had broad discretion with regard to ordering the bidding procedure. Moreover, there was ample basis in the rec-

ord even prior to the February 19 hearing for the Court to conclude that the Auction was appropriate. The fact that the Court may have sought the assistance of the Examiner, a party who is not an adversary but rather an independent third-party and an officer of the Court, to assist the Court in arriving at a bidding procedure that would not only maximize the value of the estate but would also be fair to all entities involved does not demonstrate a bias against either the PacifiCorp Entities or Green River Coal. Nor does it constitute an abdication of decision-making power. The Court sought the assistance of the Examiner in creating a fair bidding procedure once the Court had already made its decision to order that procedure.

■ The Bankruptcy Court has a *duty* to maximize the value of the estate. *See In re Food Barn Stores, Inc.,* 107 F.3d 558, 567 n. 16 (8th Cir.1997); *M.R.R. Traders, Inc. v. Cave Atlantique, Inc.,* 788 F.2d 816, 818 (1st Cir.1986); *In re Silver Bros. Co., Inc.,* 179 B.R. 986, 1007 (Bankr.D.N.H.1995). The Court's decision to conduct a bidding procedure was clearly made without bias and in recognition of that duty. At no time did the Court display any disfavor toward the PacifiCorp Entities or Green River Coal. The Auction Order was simply not a ruling *against* either party. On the contrary, the Auction Order actually gave the PacifiCorp Entities *favored status.* Not only were the PacifiCorp Entities afforded a $10 million bidding cushion, but in addition, the bidders participating in the bidding procedure were forced to bid on a form of transaction and a set of draft documents which the PacifiCorp Entities had designed and negotiated, uniquely tailored to their advantage. Significantly, the PacifiCorp Entities had ample opportunity to emerge from the Auction as the winning bidder. The PacifiCorp Entities simply elected not to participate in the Auction. The PacifiCorp Entities' real complaint is that the Court would not authorize the disposition of Big Rivers' assets to them for less value than could be achieved through an open and fair auction process. Thus, the Court-ordered bidding procedure is not evidence of bias against the PacifiCorp Entities, but rather a fulfillment of the Court's duty to protect creditors by maximizing the value of the bankruptcy estate. Of course, the Debtor also had this duty but was hampered by the "No Shopping" clause.

Likewise, Green Rivers' complaints similarly have no merit. Without substantive evidence, Green River makes general accusations that the actions of the Court and the Examiner have "disrupted" the case, and that "the Examiner and Judge Roberts have become interested parties in this case." Green River Motion at 38. Green River, however, fails to show that this Court is biased against Green River personally. Indeed, as Green River itself admits, it argued in favor of an auction at the February 19 hearing because of concerns that the PacifiCorp transaction, and the process that produced it, would not maximize the recovery to the estate. In fact, had the original plan with PKEC's proposal been confirmed, unsecured creditors, including Green River, would have received nothing. The unsecureds will receive a substantial pay-out as the result of the bidding procedure and subsequent negotiations.

After the Auction Order was entered, Green River suddenly complained that the Examiner may have participated in the development of the bidding procedure. The reasons for Green River's abrupt change in stance may be attributed to the dispute over Green River's claims. Green River has filed claims against Big Rivers in an amount in excess of $140 million arising out of the rejection of a fuel supply contract. Big Rivers has filed an adversary proceeding against Green River in Green River's Chapter 11 case, seeking a finding that such contract was void as procured by fraud. Nevertheless, Big Rivers and Green River have been involved in settlement disputes spanning many months, and Green River likely viewed its efforts to disqualify the Court as a way to increase its negotiating leverage by threatening Big Rivers' efforts to confirm its plan within the expedited time frame desired by other creditors and rate-payers. Green River, however, makes no showing of how or why the Auction Order demonstrates bias toward Green River or how it may have been prejudiced by communications between the

Court and the Examiner. In fact, just the opposite is true. As a creditor of Big Rivers, Green River stands to gain from the enhanced value to the estate achieved through the auction process.

### III. *REMOVAL OF EXAMINER IS UNWARRANTED.*

■ The Movant's request for removal of J. Baxter Schilling as the Examiner is based entirely on his participation in the alleged ex parte communications with the Court. In so far as this Motion is untimely and fails to allege bias based on an extra-judicial source, it is also denied. The alleged ex parte contacts do not support disqualification of the undersigned and, similarly, they do not support a finding that the Examiner should be removed.

### IV. *THE MOTION OF PACIFICORP ENTITIES TO STAY THE PROCEEDINGS PENDING RESOLUTION OF THE MOTIONS TO DISQUALIFY IS NOW MOOT.*

The PacifiCorp Entities' Motion to Stay the Proceedings, requests this Court stay the matter pending only a ruling on the motions discussed at length above. That matter is now moot upon entry of the Order accompanying this Memorandum–Opinion, and is, therefore, overruled.

### CONCLUSION

For the above-stated reasons, this Court by separate Order shall overrule the following Motions:

(1) PacifiCorp's Energy Company's Motion to Disqualify Bankruptcy Judge and Remove and Sanction Examiner, in which PacifiCorp Power Marketing, Inc. joins;

(2) Green River Coal Company, Inc.'s Motion to Disqualify Judge and to Remove Examiner; and

(3) PacifiCorp Kentucky Energy Co. And PacifiCorp Power Marketing, Inc.'s Motion To Stay Proceedings Pending Rulings on Motions to Disqualify the Bankruptcy Judge and Remove the Examiner.

### ORDER

Pursuant to the attached Memorandum–Opinion,

**IT IS HEREBY ORDERED** that the following Motions be, and hereby are, **OVER-RULED:**

(1) PacifiCorp Kentucky Energy Company's Motion to Disqualify Bankruptcy Judge and Remove and Sanction Examiner, in which PacifiCorp Power Marketing, Inc. joins;

(2) Green River Coal Co., Inc.'s Motion to Disqualify Bankruptcy Judge and To Remove Examiner; and

(3) PacifiCorp Kentucky Energy Company and PacifiCorp Power Marketing, Inc.'s Motion To Stay Proceeding Pending Rulings on Motions to Disqualify the Bankruptcy Judge and Remove the Examiner.

This is a final Order.